**Gabriel I. PENAGARICANO,
Plaintiff, Appellant,**

v.

**Orlando LLENZA, et al.,
Defendants, Appellees.**

**No. 83–1734.**

United States Court of Appeals,
First Circuit.

Argued March 6, 1984.

Decided Nov. 2, 1984.

Julio Maymi Pagan, Santurce, P.R., with whom Gabriel I. Penagaricano, Santurce, P.R., was on brief, for plaintiff, appellant.

Gerardo Mariani, Asst. Sol. Gen., Dept. of Justice, San Juan, P.R., with whom Mi-

guel Pagan, Deputy Sol. Gen., San Juan, P.R., was on brief, for Orlando Llenza.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and GIERBOLI-NI,[*] District Judge.

LEVIN H. CAMPBELL, Chief Judge.

Plaintiff Penagaricano, a former member of the Puerto Rico Air National Guard ("PRANG"), appeals from the judgment of the United States District Court for the District of Puerto Rico, 571 F.Supp. 888, dismissing his civil rights complaint against the PRANG and some of his superior officers for his allegedly discriminatory and unwarranted separation from the Guard. To understand Penagaricano's position, it is useful to understand the somewhat complex scheme that regulates the conduct of National Guard retention decisions. We therefore describe this first, before turning to the details of Penagaricano's complaint.

## I.

The National Guard is a component of the organized militia of the United States. 10 U.S.C. § 101. It is a unique military force in that each unit within the Guard is responsible to two governments, one local (here, the Commonwealth of Puerto Rico), and the other federal, *i.e.*, that of the United States.

The state entities[1] known as "Air National Guards" are defined at 32 U.S.C. § 101(6) as follows:

"Air National Guard" means that part of the organized militia of the several States and Territories, Puerto Rico, the Canal Zone, and the District of Columbia, active and inactive, that—

(A) is an air force;

(B) is trained, and has its officers appointed, under the sixteenth clause of section 8, article I, of the Constitution;

(C) is organized, armed, and equipped wholly or partly at Federal expense; and

(D) is federally recognized.

"Federal Recognition" means acknowledgment by the federal government that the persons appointed by the state to the Guard meet the prescribed federal standards for their particular service grade. ANGR 36-02, ¶ 1-i. This acknowledgment is performed by special boards appointed by the Secretary of the Air Force, or for ranks under general, by the state Adjutant General. ANGR 36-03, ¶ 3. Members of the Air National Guard, as a consequence of federal recognition, concurrently hold membership in a distinct federal military organization, the Air National Guard of the United States ("ANGUS"). 10 U.S.C. § 8351(a).

A "Vitalization Program" has been instituted for the Air National Guard. The program requires that all officers in the Air National Guard who have completed 20 years of commissioned service be considered each year to determine whether they shall be retained in the Guard. ANGR 36-06. The program is designed to ensure that the Air National Guard does not become top-heavy with senior officers who would block the promotions of deserving junior officers. *Id.* ¶ 1. Under the program, the Adjutant General ("AG") of each Air National Guard must appoint advisory boards to "evaluat[e] the future benefits that can be expected to accrue to the Air National Guard from the continued service" of the senior officers under consideration. *Id.* ¶ 10-d. In making their nonbinding recommendations to the AG, the advisory boards consider factors including, "but not ... limited to the following":

[*] Of the District of Puerto Rico, sitting by designation.

**1.** The local governments to which National Guard units may be responsible include the local governments of states, territories of the United States, Puerto Rico, the Canal Zone, and the District of Columbia. 32 U.S.C. § 101(6).

For the sake of convenience, we refer to all these entities as "state" governments or states although, of course, Puerto Rico is not a state but enjoys a unique political relationship of its own with the United States. In the present case, the differences between Puerto Rico and a state are immaterial.

(1) Demonstrated performance and potential ....

(2) The availability of the individual for military activities in light of the demands of his civilian occupation.

(3) Past record of interest in and dedication to the Air National Guard.

(4) Status with regard to Air Technician retirement eligibility.

(5) Rated capability and potential as a crewmember in future years ....

(6) Availability of replacement officer with less service who may be lost due to mandatory promotion if high grade vacancies do not exist.

(7) The ratio of officers in an age or service bracket as relates to maintaining an age/grade/service balanced force.

(8) Growth potential for replacing present leaders.

(9) Latest report of medical examination and physical fitness.

(10) Other factors bearing on a plan for assuring a viable combat ready military unit in future years.

*Id.* ¶ 10–e. If the AG determines that an officer should not be retained, he notifies the Chief, National Guard Bureau, who then issues orders withdrawing the officer's federal recognition. *Id.* ¶ 11–b(2), c(1).

Once federal recognition is withdrawn, the AG must discharge the officer from the state's Air National Guard. The discharged officer is at the same time automatically separated from the ANGUS. If the officer is also a technician employed by the Guard under the National Guard Technicians Act of 1968, 32 U.S.C. § 709, the AG is required to terminate this civilian employment once the officer is separated from the ANGUS.[2]

Air National Guard Regulation 36–06 does not itself provide a means for a reject-

ed officer to obtain review of the decision not to retain him. There are, however, other military administrative procedures available to such an officer to protest his nonretention. These administrative procedures reflect the dual nature of the Guard; to secure complete relief, *i.e.*, to be reinstated as an officer of the Air National Guard, an officer must pursue remedies both within ANGUS and within the Air National Guard of his state.

The remedy within ANGUS is that available generally to officers of the United States Air Force, ANGUS being a part of the United States Air Force Reserve. The complainant may go to the Air Force Board for Correction of Military Records ("AFBCMR"), which has authority to "correct any military record ... when ... necessary to correct an error or remove an injustice." 10 U.S.C. § 1552. If the AFBCMR determines that an officer's nonretention in the Air National Guard was the consequence of error or injustice, the Board can correct the officer's *federal* records to show that his federal recognition has not been withdrawn and that he remains a member in good standing of the ANGUS. While the Board cannot direct his reinstatement in the National Guard of the state, it can reinstate him in a comparable active federal reserve status, restore his pay and order compensatory back pay.

A favorable finding by the AFBCMR may thus include significant relief, although the AFBCMR has no power to force a state to reinstate the officer in the state's Air National Guard. To gain reinstatement in the state Air National Guard, the officer must seek whatever administrative relief is afforded under state law.

## II.

Turning to the present facts, plaintiff Penagaricano was a federally recognized

---

**2.** The Air National Guard hires "technicians" who perform such services as maintaining equipment and facilities, training, and clerical support. By virtue of the National Guard Technicians Act of 1968, 32 U.S.C. § 709, these technicians gained federal employee status and the protections of civil service employment. To be

a civilian technician, the Act requires that technicians maintain military membership in the National Guard. *Id.* § 709(b). The Act also requires that these dual status employees be separated from their civilian employment if they cease to hold the military grade specified for their position. *Id.* § .709(e)(1).

member of the Puerto Rico Air National Guard and thus a member of the Air National Guard of the United States. In 1976, he was promoted to the rank of full Colonel in the PRANG by state authority. A request for federal recognition was sent to the Pentagon, but in January 1977, the newly appointed AG of the PRANG, defendant Orlando Llenza, rescinded the promotion order and withdrew the petition for federal recognition. By March 1977, Llenza had demoted Penagaricano to flight safety officer and promoted Fred Brown to Penagaricano's former position of Commander of the 156 Tactical Fighter Group. In August 1977, Penagaricano also was demoted in his civilian capacity as a technician when his civil service classification was lowered from a GS–14 to a GS–13. Fred Brown was promoted to a GS–14, which was the only existing GS–14 position. Penagaricano appealed the civilian demotion, and a federal civil service administrative examiner ruled that the change to a lower job grade should be set aside. Llenza ignored the ruling.[3]

In 1980, Adjutant General Llenza appointed an Advisory Board of Selective Retention pursuant to ANGR 36–06 to consider whether 19 officers should be retained by the PRANG. The Board members were defendants Fred Brown, Jose A. Bloise, and Francisco Rivera Cintron. They took the oath required by the regulations, which affirms that they will perform their review duties "faithfully, without prejudice or partiality." ANGR 36–06, ¶ 10–b. Penagaricano alleges that he was not permitted to appear before the Board, either in person or by counsel. He also alleges that minutes of the Board's proceedings were not kept and that Brown was permitted to vote on Penagaricano's retention despite Brown's personal interest in the outcome of the retention deliberations.

The Board recommended that two officers be separated from the PRANG, one of whom was Penagaricano. Adjutant General Llenza approved the findings of the Advisory Board, and Penagaricano was discharged from the ANGUS, the PRANG, and from his civilian employment as a technician.

Penagaricano did not appeal from the nonretention order to the AFBCMR, nor did he pursue a remedy available under the laws of Puerto Rico. *See* P.R.Laws Ann. tit. 25, § 2802 ("Any member of the Military Forces of Puerto Rico[, which includes the PRANG,] who believes himself aggrieved by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commanding officer, who shall forward the complaint to the Governor or Adjutant General.").

Instead, on April 24, 1980, Penagaricano filed a complaint in the Superior Court of Puerto Rico, San Juan Part, under the Puerto Rico civil rights statute, P.R.Laws Ann. tit 32, §§ 3524 *et seq.* (1974). He sought damages, mandamus, and injunctive relief against the PRANG, the Honorable Carlos Romero Barcelo in his capacity as the Commander-in-Chief of the Puerto Rico National Guard, Orlando Llenza, personally and in his capacity as the AG of the PRANG, and unnamed members of the Selective Retention Board. On May 16, 1980, the complaint was amended to name Fred Brown, Jose A. Bloise, and Francisco Rivera Cintron as the members of the Advisory Board.

Penagaricano alleged that the defendants applied the relevant regulations in an arbitrary and discriminatory manner as part of a conspiracy to deprive Penagaricano of his civilian and military employment with the Guard because of his political ideas and affiliations. He also alleged that procedural defects in the way in which the defendants terminated Penagaricano's employment violated his due process rights.

On June 5, 1980, Brown removed the superior court case to the federal district

---

3. Under this system, unlike the regular civil service, the final decision rests with the PRANG Adjutant General, and no appeal may be taken.

court. Penagaricano opposed the removal and sought a remand to the Superior Court of Puerto Rico. On January 29, 1982, Judge Carmen Cerezo of the United States District Court for the District of Puerto Rico denied Penagaricano's motion to remand, holding that removal was proper under 28 U.S.C. § 1442a because the Advisory Board members were federal military personnel performing federal duties. Subsequently, the district court issued a partial summary judgment order dismissing the action against the Honorable Carlos Romero Barcelo.

Penagaricano amended his complaint on August 30, 1983 to allege a cause of action under 42 U.S.C. § 1983. The case was thereupon submitted on plaintiff's motion for summary judgment, defendants' motion for judgment on the pleadings, and a stipulation of facts. On September 7, 1983, the district court issued an opinion dismissing the complaint. The district court held, *inter alia,* that the eleventh amendment barred the claims against the National Guard and Adjutant General Llenza in his official capacity, and that the Advisory Board members were federal officers who

could be sued only under the Federal Tort Claims Act. The district court also ruled that the entire case was a nonjusticiable military matter. Penagaricano appealed to this court.[4]

■ We agree that Penagaricano's claims present a nonjusticiable[5] military controversy and affirm on that basis. We reach this result, however, somewhat differently than did the district court. In particular, we do not see *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), a case relied on heavily below, as directly controlling, although, to be sure, the Supreme Court's emphasis in that decision on the importance of the military's decisionmaking autonomy is relevant. *Chappell* involved the question of whether the Court would recognize a *Bivens*-type cause of action for enlisted men suing their superior officers. By contrast, the determining issue here is whether Penagaricano's claim to reinstatement is justiciable given the special characteristics of the military setting. Although the "special factors" the Court discussed in deciding not to fashion a *Bivens* remedy[6] are con-

4. Because this court had trouble ascertaining the controlling federal law and regulations, it requested the Solicitor General of the United States to file an amicus brief on the matters relating to the administration of the National Guard generally. This was done, with the United States opposing Penagaricano's claim on the grounds that he was required to have sought review by the Air Force Board for the Correction of Military Records and, more generally, because his complaint presented a nonjusticiable military question. We are grateful to the Justice Department for having clarified the regulatory policies in this area.

5. For these purposes, we use the terms "nonjusticiable" and "nonreviewable" interchangeably. *See Dillard v. Brown,* 652 F.2d 316, 322 n. 4 (3d Cir.1981).

6. In *Chappell,* the Court refused to recognize a *Bivens*-type remedy for enlisted men suing their superior officers for alleged violations of the men's constitutional rights.

The *Chappell* Court analyzed the men's nonstatutory constitutional claims under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Court noted that "[b]efore a *Bivens* remedy may be fashioned ...

a court must take into account any 'special factors counselling hesitation.'" *Chappell,* 103 S.Ct. at 2364. The Court then found that "[t]aken together, the unique disciplinary structure of the military establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." *Id.* at 2367.

The Court repeatedly emphasized the first special factor: *the necessity for judicial restraint in hearing claims involving military discipline* and the relationship between military personnel and their superior officers. It noted:

The need for special regulations in relation to military discipline, and the consequent need and justification for a special and exclusive system of military justice, is too obvious to require extensive discussion.... [W]e must be "concern[ed] with the disruption of '[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his superiors into court."

*Id.* at 2365–67 (*quoting United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954)).

The second "special factor" was Congress's activity in the field. The Court noted that Con-

siderations to be balanced in the justiciability equation, the *Chappell* reasoning does not directly control the issue before us.

The analysis this and most other circuits have endorsed for determining the reviewability of claims arising incident to military service was first stated by the Fifth Circuit in *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971).[7] *See Pauls v. Secretary of the Air Force,* 457 F.2d 294 (1st Cir.1972); *see also Rucker v. Secretary of the Army,* 702 F.2d 966 (11th Cir.1983); *Nieszner v. Mark,* 684 F.2d 562 (8th Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1273, 75 L.Ed.2d 494 (1983); *Lindenau v. Alexander,* 663 F.2d 68 (10th Cir.1981); *NeSmith v. Fulton,* 615 F.2d 196 (5th Cir.1980); *Schlanger v. United States,* 586 F.2d 667 (9th Cir. 1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Williams v. United States,* 541 F.Supp. 1187 (E.D.N.C. 1982); *Doe v. Alexander,* 510 F.Supp. 900 (D.Minn.1981); *BenShalom v. Secretary of the Army,* 489 F.Supp. 964 (E.D.Wis.1980); *Bollen v. National Guard Bureau,* 449 F.Supp. 343 (W.D.Pa.1978). *But see Dillard v. Brown,* 652 F.2d 316 (3d Cir.1981); Note, *Judicial Review of Constitutional Claims Against the Military,* 84 Colum.L. Rev. 387 (1984).

The *Mindes* court reasoned that when a court is faced with the issue of when internal military affairs should be subjected to judicial review,

> What we really determine is a judicial policy akin to comity. It is a determination made up of several subjective and interrelated factors. Traditional judicial trepidation over interfering with the mili-

tary establishment has been strongly manifested in an unwillingness to second-guess judgments requiring military expertise and in a reluctance to substitute court orders for discretionary military decisions. Concern has also been voiced that the courts would be inundated with servicemen's complaints should the doors of reviewability be opened. But the greatest reluctance to accord judicial review has stemmed from the proper concern that such review might stultify the military in the performance of its vital mission.

*Mindes,* 453 F.2d at 199. The court then distilled from the case law a test that reflected the unique concerns present in this area:

> [A] court should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> A district court faced with a sufficient allegation must examine the substance of that allegation in light of the policy reasons behind nonreview of military matters. In making that examination, such of the following factors as are present must be weighed (although not necessarily in the order listed).
>
> 1. The nature and strength of the plaintiff's challenge to the military determination. Constitutional claims, normally more important than those having only

---

gress, exercising its plenary authority over the military, has enacted a "comprehensive internal system of justice to regulate military life" but has not provided a damages remedy for claims by military personnel that their constitutional rights have been violated by superior officers. The Court concluded that judicial creation of a remedy would be "plainly inconsistent with Congress' authority in the field." *Id.* 103 S.Ct. at 2367.

7. Because the district court apparently did not reach its decision by using the *Mindes* test, the proper procedure would ordinarily be to vacate the district court's order and remand for a de-

termination of reviewability using *Mindes,* and for resolution of Penagaricano's claims, if they are determined to be justiciable. *See Mindes,* 543 F.2d at 202. But since the district court resolved the issue on cross-motions for summary judgment and judgment on the pleadings based on facts stipulated at a pretrial conference, we are able to resolve the questions of law based on those facts. *See Rucker v. Secretary of the Army,* 702 F.2d 966, 969 n. 6 (11th Cir.1983); *West v. Brown,* 558 F.2d 757, 759 (5th Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 520 (1978).

a statutory or regulatory base, are themselves unequal in the whole scale of values—compare haircut regulation questions to those arising in court-martial situations which raise issues of personal liberty. An obviously tenuous claim of any sort must be weighted in favor of declining review....

2. The potential injury to the plaintiff if review is refused.

3. The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.

4. The extent to which the exercise of military expertise or discretion is involved. Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions.

We do not intimate how these factors should be balanced in the case *sub judice.* That is the trial court's function.

*Id.* at 201–02.

Penagaricano has satisfied the first part of the *Mindes* threshold test by alleging that the defendants deprived him of his first amendment right of association and of his right to due process. Penagaricano has failed, however, to exhaust the administrative remedies available to him, which arguably compels a conclusion of nonjusticiability even before we reach the four-part balancing test also mandated by *Mindes.*

As a general rule, and particularly under *Mindes,* courts demand that military personnel with grievances against the military establishment or its personnel must exhaust the administrative remedies provided by the military service before seeking relief in civilian courts. *See Hodges v. Callaway,* 499 F.2d 417 (5th Cir.1974) (serviceman's challenge to discharge decision dismissed without prejudice for failure to exhaust administrative remedies); *Horn v.*

*Schlesinger,* 514 F.2d 549 (8th Cir.1975) (dismissing plaintiff's claim for review of discharge and for reinstatement, stating that exhaustion is particularly applicable in cases involving retention and promotion of military personnel). This is a section 1983 action, however, which leads to the question of whether the Court's recent holding in *Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), reiterating that exhaustion is unnecessary in section 1983 cases, is applicable in a military setting.

The defendants attempt to distinguish *Patsy, see Sanders v. McCrady,* 537 F.2d 1199 (4th Cir.1976) (affirming dismissal of section 1983 action by national guardsman against AG and various federal officials because guardsman failed to exhaust remedy before the Army Board for Correction of Military Records), and emphasize that under traditional exhaustion analysis, exhaustion should be required. *See McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *United States v. Sweet,* 499 F.2d 259 (1st Cir.1974). Penagaricano counters that *Patsy* indeed controls and further that the nature of the tribunals that could hear his appeal and the circumstances of the case would warrant review even under traditional analysis. We need not attempt to resolve this issue because even if Penagaricano's bid for review survives the *Mindes* threshold inquiry, the balance of *Mindes* factors favor a finding of nonjusticiability. We now deal with these in turn:

A. *Nature and Strength of Penagaricano's Challenge to the Military Determination*

Penagaricano alleges that (1) by failing to provide him with a hearing or counsel and by allowing Fred Brown to participate in the retention decision, the defendants deprived Penagaricano of procedural due process, and (2) because of Penagaricano's political persuasion, the defendants applied the regulations in an arbitrary and discriminatory manner, thus infringing upon Pena-

garicano's first amendment right of association.

■ The first claim is insubstantial. Penagaricano does not have a constitutionally protected property interest in continued employment with the Guard. *See Tennessee v. Dunlap,* 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1976) (civilian technician loses any entitlement to his position when his enlistment as a military member of the National Guard ends); *Pauls v. Secretary of the Air Force,* 457 F.2d 294, 297 (1st Cir.1972) ("It is well-established law that military officers serve at the pleasure of the President and have no constitutional right to be promoted or retained ....."). Thus, no process is due Penagaricano.[8]

Penagaricano's second claim, however, is not obviously "tenuous." *Mindes,* 453 F.2d at 201. The allegation that the officers, motivated by political differences with Penagaricano, acted arbitrarily and discriminatorily in their application of the regulations, thereby violating Penagaricano's first amendment right of association, is sufficient on its face. Thus, the first *Mindes* factor favors review.

### B. The Potential Injury to Plaintiff if Review is Refused

Penagaricano is 49 years old and has lost both military and civilian employment. At the time of his discharge, he had no rights to a technician's pension, but he had qualified for a military pension.

If this court refuses review, Penagaricano still will be able to seek relief from the AFBCMR under 10 U.S.C. § 1552 and from the AG or the Governor of Puerto Rico under Puerto Rico law. We decline to adopt Penagaricano's pessimism regarding his chances of prevailing should he present proper grounds. The AFBCMR, in particu-

lar, would approach the case without any prior involvement, and with far greater expertise than a court in reviewing military retention decisions. We "indulge, until otherwise convinced, in the presumption that the military will be astute [enough] to afford to the plaintiff all of the rights and protections afforded him by the Constitution, the statutes, and its own regulations." *Horn,* 514 F.2d at 553 (footnote omitted). The refusal of judicial review, therefore, would not leave Penagaricano remediless.

We recognize, nonetheless, that the AFBCMR may not be able to afford complete relief, *see* page 57, *supra,* and the cost and delay resulting from a dual appeal could exacerbate the hardships caused by Penagaricano's separation from the Guard. And while Penagaricano's service remedies afford a meaningful opportunity for obtaining whatever relief may be due, they are arguably somewhat less effective in certain ways than a judicial remedy. Thus we shall assume that the second *Mindes* factor also tips, but not strongly, in Penagaricano's favor.

### C. The Type and Degree of Anticipated Interference with the Military Function

While the two previous *Mindes* elements favor Penagaricano, the third one points strongly in the other direction. The type of interference which judicial review poses here is not a mere matter of administrative inconvenience. If courts were routinely to entertain complaints like Penagaricano's, the Vitalization Program, designed to make room for more active, junior officers, could be significantly impaired. Claims challenging Selective Retention Board decisions and requests for reinstatement, while pending for several years in civilian court, may well

---

**8.** Penagaricano did not allege or prove special circumstances that might arguably have created an entitlement. *Cf.* NeSmith, 615 F.2d at 200 (dismissed as technician before enlistment terminated; therefore, had protected property interest and could not be removed without finding of "cause"); *Bollen,* 449 F.Supp. 343 (entitlement created by letter assuring plaintiff of retention until specified age).

Further, Penagaricano does not challenge the regulations as constitutionally insufficient. *Cf. Rucker,* 702 F.2d at 971 (allowing review of constitutional challenge to regulations but not of ultimate disposition of plaintiff's case (*i.e.,* discharge, retention)).

force the PRANG to "exist in limbo awaiting the outcome of lengthy litigation, rather than conducting an orderly training program directed to sharpening its operational readiness." *Turner v. Egan*, 358 F.Supp. 560, 564 (D.Ala.), *aff'd*, 414 U.S. 1105, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973).

Judicial review may also undercut the ability of the military to make judgments based on criteria of military efficiency. If civilian courts are regularly open to claims challenging retention decisions, the officers on the Selective Retention Boards may be deterred from considering subjective, although proper, criteria. *See Woodard v. Marsh*, 658 F.2d 989, 994 (5th Cir.), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1981). They would have every incentive to rely solely on the officer's objective record so that they could explain their decision easily when called into court. This is plainly counter to the spirit of the regulations, which encourage the boards to consider a wide range of subjective and objective factors in making their determinations.

We are of the opinion that the degree of interference with the military function generated by federal court review of a claim like Penagaricano's would be "such as to seriously impede the military in the performance of vital duties." *Mindes*, 453 F.2d at 201.

### D. The Extent to which the Exercise of Military Expertise or Discretion is Involved

The final *Mindes* factor also tips strongly in favor of the defendants. The decision Penagaricano challenges requires the highest degree of military discretion and expertise. Courts traditionally have deferred to the "superior knowledge and experience of professionals" in such matters as duty orders, promotions, demotions, and retention decisions. *Mindes*, 453 F.2d at 202; *see, e.g., Reaves v. Ainsworth*, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225 (1911) (refusing to review claim that Army medical board's finding that plaintiff was unfit for promotion was arbitrary and capricious); *Rucker*,

702 F.2d at 791 ("While we may order the Army to afford Rucker his rights created by [the regulations] and to exercise due consideration once these rights are afforded, we may not order the Army to exercise its discretion one way or another."); *Silverthorne v. Laird*, 460 F.2d 1175, 1186–87 (5th Cir.1972) (same); *BenShalom*, 489 F.Supp. at 970–71 ("Strong policies compel the courts to give the military 'the widest possible latitude' in the administration of personnel matters.") (*quoting Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979)).

In this case, the discretion entrusted to the Selective Retention Board and the AG in making retention decisions is virtually limitless. The regulations clearly require the officers to apply their expertise regarding projected PRANG needs and present requirements when making retention decisions. *See* ANGR 36–06, ¶ 10(5)–(8), (10). The regulations set out a nonexclusive list of varied criteria that the Board "should" consider in reaching its decision. ANGR 36–06, ¶ 10–e; *see supra*, page 57. Moreover, the regulations explicitly state that "[t]he recommendations of the board are advisory only." *Id.* ¶ 10–f. Thus, final retention decisions lie within the discretion of the AG, who is required to convene the advisory board but need not accept its decision.

It is true that Penagaricano's political discrimination claim would, in theory, require the court only to scrutinize that aspect of the retention decision. *See Bollen*, 449 F.Supp. at 349. But as a practical matter, there would be no way for the court to reach a judgment without exposing itself to all the pros and cons of the decision. This last *Mindes* factor, then, strongly argues against exercising review over this matter.

The *Mindes* court indicates that the above factors should be balanced but declined to indicate how they should be weighted. *Mindes*, 453 F.2d at 202. We are inclined to weigh the last two factors heavily in view of the reservations many courts have expressed as to a civilian

court's authority to countermand a military decision or order that is within the decision-maker's sphere of discretion and expertise. We noted in *Pauls* that civilian courts have "no jurisdiction to order the promotion of an officer or to overrule the decision not to promote." 457 F.2d at 297. Similarly, the *Rucker* court intimated that it did not have the authority to review cases and order relief where the challenged action was purely discretionary. *Rucker*, 702 F.2d at 971 (no other factors considered when decision challenged was within discretion of military authorities); *see also Thornton v. Coffey*, 618 F.2d 686 (10th Cir.1980) (expressing doubt whether power of court extends to ordering military promotions); *Silverthorne*, 460 F.2d at 1186–87 (5th Cir. 1972) ("Our power in this matter is limited to requiring the Army to comply with its ministerial duties enumerated in [the regulations] .... [I]n no case could we dictate that the Army exercise its discretion one way or the other.").

The Supreme Court seems clearly to be of a similar mind. Thus it recently said,

Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment.

*Chappell*, 103 S.Ct. at 2365. Where, as here, the predisposition to decline review suggested in *Chappell* reinforces a balance of the *Mindes* factors that favors a finding of nonreviewability, we feel the result is clear. We affirm the district court's holding that Penagaricano's claims constitute a nonjusticiable military controversy.

*Affirmed.*